## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LIN ROGERS, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br>     v.<br><br>GRAVY ANALYTICS, INC.,<br><br>          Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Lin Rogers ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action complaint against Defendant Gravy Analytics, Inc. ("Gravy Analytics" or "Defendant"). Plaintiff makes his allegations upon personal knowledge as to facts pertaining to himself, and on information and belief as to other matters.

### NATURE OF THE ACTION

1.     This is a class action arising from Defendant's monetization of personally identifying information ("PII"), including geolocation data, without adequate disclosure to Plaintiff and class members.

2.     Defendant, either directly from third-party applications, via other data brokers, or through online advertising bid streams[1], collected, stored, shared, and/or used Plaintiff and other

---

[1] Online advertising bid streams refer to the real-time bidding process and the exchange of information between ad publishers and advertisers.  Specifically, publishers exchange information with advertisers such as location information of potential ad targets and other often private information about the ad target so the advertiser can determine whether or how much to bid for showing advertising to the target on a particular web location.  It is basically an auction.  However, given the exchange of data that occurs, data companies can obtain user data through bid streams not for the purpose of actually showing advertising, but to take (or scrape) the data to include in its own products to sell to other customers. Here, Gravy Analytics used bid streams to obtain or scrape location data which it then sold to whoever wanted to purchase it.

class members' sensitive personal information—including historical and real-time geolocation data ("Personal Information")—without their informed consent.

3.      Defendant Gravy Analytics is a location intelligence and insights company that obtains and analyzes consumer location data from third party suppliers. These suppliers often amass consumer data from the mobile advertising marketplace, or from smartphone apps downloaded onto consumers' mobile devices.

4.      Defendant Gravy Analytics has purchased or obtained (through online bid streams or otherwise) location data from thousands of third-party applications, including Tumblr, a social networking application used by 135 million active users per month.[2]

5.      In December 2024, Gravy Analytics was sued by the Federal Trade Commission for unlawfully tracking and selling consumers' location data, including data that could be used to track consumers to sensitive locations such as places of religious worship, domestic abuse shelters, medical facilities, and homeless shelters. The suit resulted in an order forbidding Gravy Analytics from selling, licensing, transferring, sharing, disclosing, or otherwise using sensitive geolocation data.[3]

6.      In or around early 2025, the news broke that Gravy Analytics had been subject to a hack and data breach.[4]  Not only did the data breach expose sensitive geolocation data held by Gravy Analytics at significant scale, but it involved data that was acquired by Gravy Analytics "without users' or even app developers' knowledge."[5]  That is, Gravy Analytics collected and sold geolocation data from users without ever obtaining consent to obtain the data in the first place.

---

[2] https://www.demandsage.com/tumblr-
statistics/#:~:text=Globally%2C%20Tumblr%20has%20135%20million,users%20in%20the%20
United%20States.

[3] https://www.ftc.gov/system/files/ftc_gov/pdf/2123035gravyanalyticsorder.pdf

[4] https://www.wired.com/story/gravy-location-data-app-leak-rtb/

[5] *Id.*

7.      The same article that reported on the data breach stated that Gravy Analytics, either on its own, through agents or vendors, or in its transactions with other data brokers, "appears to be acquiring their data from the online advertising 'bid stream,' rather than code embedded into the apps themselves."[6]  The article continues: "This is a nightmare scenario for privacy, because not only does this data breach contain data scraped from the RTB [*i.e* real-time bidding] systems, but there's some company out there acting like a global honey badger, doing whatever it pleases with every piece of data that comes its way[.]"[7]  Regardless of how Gravy Analytics obtained the data, one thing is clear, it profited from the data by selling it without the consent of users.

8.      The data hacked from Gravy Analytics included "tens of millions of mobile phone coordinates of devices inside the US[.]"[8]  The reporters extracted the application names from the leaked data, which included Tumblr.  That is, certain of the geolocation coordinates leaked in the Gravy Analytics data breach came from the Tumblr application, as confirmed by third party investigators.[9]

9.      This action rises from Defendant's sale, transfer, distribution, and/or monetization of its users' PII, including geolocation data, to third parties without users' consent.

10.     As a result of Defendant's conduct, Plaintiff's and class members' privacy has been invaded, and their Personal Information has been collected, stored, shared, used, and/or monetized without their consent.

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9]
https://docs.google.com/spreadsheets/d/1Ukgd0gIWd9gpV6bOx2pcSHsVO6yIUqbjnlM4ewjO6
Cs/edit?gid=1257088277#gid=1257088277

## PARTIES

11.     **Plaintiff Lin Rogers ("Plaintiff Rogers")** is an adult citizen of the state of Massachusetts and resides in Somerville, Massachusetts.

12.     Plaintiff Rogers used Tumblr's website and App on a regular basis since approximately 2018, including in his workplace and home.

13.     While he had the App on his phone, Plaintiff Rogers routinely traveled with his phone to various locations—including his home, work, medical appointments, religious services, and other places he considers sensitive and private.

14.     At the time Plaintiff Rogers downloaded the App, he believed that the App would not transfer his personal or geolocation data to another entity for the purposes of selling said data or to expose his personal or geolocation data through an unsupervised bidding process.

15.     However, that was not the case. Tumblr's App sent or exposed personal or geolocation data to third parties when Plaintiff Rogers used the App. During that entire time, the App tracked the geolocation of Plaintiff Rogers. In turn, Tumblr tracked Plaintiff Rogers's geolocation in Massachusetts, and then monetized, sold or exposed that data to companies such as Defendant Gravy Analytics. Plaintiff Rogers suffered his primary injury in Massachusetts.

16.     Plaintiff Rogers has no relationship with Gravy Analytics and never consented to Gravy Analytics obtaining, selling, sharing, or transferring his precise geolocation data.

17.     Plaintiff Rogers has not consented to having his personal or geolocation data monetized, sold or exposed to third parties for valuable consideration. If Plaintiff Rogers had been aware that Tumblr would receive, monetize and/or expose his geolocation data to third parties such as Defendant Gravy Analytics, Plaintiff Rogers would not have used the App.

18.     **Defendant Gravy Analytics, Inc.**, is a Delaware corporation with its principal office or place of business at 44679 Endicott Dr Suite 300, Ashburn, VA 20147.

19.    Defendant Gravy Analytics at one point claimed to collect and process more than 17 billion signals from approximately a billion devices daily. Defendant Gravy Analytics obtained consumer location data from other data suppliers, some of whom themselves obtained the location data from other data suppliers, the mobile advertising marketplace, or mobile applications.

20.    The list of data brokers and third-party suppliers who have sold or otherwise sent geolocation and PII to Gravy Analytics is not public or available to Plaintiff but is known to Gravy Analytics.

21.    The means through which Gravy Analytics obtains location data is further concealed by its reliance on third-party applications and data sources.

22.    Gravy Analytics obtained this location data from third party suppliers in part to compile massive troves of valuable customer geolocation data that it could then disclose to other third parties—in this case, commercial customers—for a price.

23.    Defendant Gravy Analytics would deliver bulk geolocation data, gleaned from third parties such as Tumblr, to its customers through file transfers, or through providing access through an Application Programming Interface ("API"). In addition to continuously sending updates with new consumer data to its customers, Gravy Analytics used to offer its customers the opportunity to search and receive at least three years of historical data.

24.    Plaintiff did not consent to having his personal or geolocation data sold to or monetized by third parties such as Defendant Gravy Analytics for valuable consideration.  If Plaintiff had been aware that his geolocation data were being transmitted through the Tumblr application, Plaintiff would not have used the Tumblr App.

25.     Plaintiff did not consent to having his personal data and geolocation data monitored and acquired during the RTB process by third parties like Defendant Gravy Analytics or any persons or entities acting on its behalf.  If Plaintiff had been aware that Tumblr was giving third

parties such as Defendant Gravy Analytics access to his data through the RTB process, Plaintiff would not have used the Tumblr App.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member (including the named plaintiff) is a citizen of a state different from Defendant.

27.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the events that gave rise to this cause of action occurred here.

28.     This court has personal jurisdiction over Defendant because a substantial portion of the events giving rise to this cause of action occurred here and because this action arises out of Defendant's forum-related contacts, including the sale of Massachusetts-based location data. Plaintiff is domiciled and suffered his primary injury in this district.

## FACTUAL ALLEGATIONS

### A. Data Brokers and Real-Time Bidding: The Information Economy

29.     While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[10] data brokers generally generate revenue by transferring personal data.[11]

30.     "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise

---

[10] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, 7 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://techpolicy.sanford.duke.edu/wp-content/uploads/2021/08/Data-Brokers-and-Sensitive-Data-on-US-Individuals-Sherman-2021.pdf

[11] https://digitalpolicyalert.org/event/8990-introduced-massachusetts-data-privacy-protection-act-sd-745-including-data-broker-registration-requirement

shar[ing] the data with third parties."[12]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[13]

31.    For instance, a NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)."  The former "is data that has been collected and is actual," such as websites visited."  Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do.  On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[14]

32.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[15]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[16]

33.    This data collection has grave implications for Americans' right to privacy.  For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration

---

[12] SHERMAN, *supra*, at 2.

[13] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, https://cse.engineering.nyu.edu/~tehila/pubs/cosn2015voters.pdf

[14] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/pdfjs/?file=/publications/download/data_brokers_and_security_20-01-2020.pdf?zoom=page-fit

[15] SHERMAN, *supra*, at 1.

[16] *Id.*

and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[17]

34.     As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights.  Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

> …

> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[18]

35.     Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[19]

---

[17] *Id.* at 9.

[18] *Id.*

[19] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

**Figure 1**:



36.     Data brokers like Defendant Gravy Analytics can compile such wide swaths of information in part by collecting users' geolocation data, which are used by Defendant Gravy

Analytics to track users across the Internet.[20]  These data brokers also share their information amongst one another and other entities to create even more replete user profiles.

37.    These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[21]

38.    In short, by collecting or purchasing PII and geolocation data derived from third-party applications, data brokers like Gravy Analytics can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder.

## B.  Real-Time Bidding

39.    "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[22]

40.    "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)."  An SSP "work[s] with website or app publishers to help them participate in the RTB process."  "DSPs primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid

---

[20] *Id.* at 11.

[21] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

[22] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/

prices they put forth."[23]   And an Advertising Exchange allows advertisers and publishers to use the same technological platform, services, and methods, and "speak the same language" to exchange data, set prices, and ultimately serve an ad.

41.    In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

42.    The RTB process works as follows:

> After a user loads a website or app [like Tumblr], an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more.  After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost.  But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process.  This information can be added to existing dossiers DSPs have on a user.[24]

---

[23] Geoghegan, *supra*.

[24]    Geoghegan, *supra*; *see also* OPENRTB, APPSFLYER, https://www.appsflyer.com/glossary/openrtb/; *see also* REAL-TIME BIDDING (RTB), APPSFLYER, HTTPS://WWW.APPSFLYER.COM/GLOSSARY/REAL-TIME-BIDDING/

**Figure 2:**



43.     Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about, for example, Tumblr's users to procure the greatest interest from advertisers and the highest bids.  The RTB process is similar regardless of the underlying application.

44.     In other words, an SSP can solicit the highest bids for ads displayed to Tumblr application (and other software application) users by identifying and de-anonymizing the users of the underlying third-party application. This includes users' IP addresses or geolocation data, which are used in conjunction with other PII to match users in data brokers' repositories.  If there is a match between, for example, Tumblr users and the profiles previously collated by data brokers, then Tumblr can solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

45.     This naturally enriches the application developer, as its users have now become more valuable. It also enriches Defendant Gravy Analytics, as the data of Apps users can be folded

into the user data that Gravy Analytics already owns, enhancing the data set it thereafter sells to other customers.

**C.    Tumblr and Other Third-Party Applications Knowingly or Unknowingly Collect Sensitive Information (Such as Geolocation Data) From Millions of Devices, and Gravy Analytics Profits From That Data**

46.    Tumblr obtains personal information and location information on more than 135 million active users each month.[25]

47.    Tumblr displays ads on the non-premium version of its App. Tumblr works with "brands and marketers to provide advertising that is as relevant and useful as possible."[26]

48.    Plaintiff's geolocation has been either sold by Tumblr or exposed through the RTB process and was ultimately (either directly or indirectly) obtained by Gravy Analytics.

49.    The list of advertisers and companies who have access to Tumblr's RTB process for buying ad space on its application is not public or available to Plaintiff.  However, data from Tumblr was confirmed to be found in the hacked data from Gravy Analytics.  Therefore, either directly or through a series of transactions, Gravy Analytics obtained and sold location data derived from Tumblr users, including Plaintiff.

50.    Software applications obtain location data from users in two major ways: (1) through use of embedded software (a software development kit) which they are paid to incorporate into the application by data companies; or (2) through the RTB process.  In the second instance, if there is a company harvesting data from the RTB process, the application developer may not be aware that its user data is being harvested by a third party.  Discussing the Gravy Analytics data

---

[25] 22 Leading Social Media Platforms For 2025 (Ranked By Monthly Active Users), https://adamconnell.me/social-media-platforms/#:~:text=blogs%20and%20bloggers.-,Stats%3A,8.6%20million%20posts%20every%20day

[26] "Tumblr Ads & You," https://help.tumblr.com/knowledge-base/tumblr-ads-you/

breach, one news outlet wrote that some of the hacked data appeared to have been sourced through the RTB process:

> It's important that the data appears to be sourced through real-time bidding, because that dictates who is responsible (rogue members of the advertising industry and the tech giants that facilitate that industry), how users can protect themselves (attempting to block ads), and the fact that massive app publishers may not even be aware their users' data is being harvested and therefore might not know how to stop it. An app developer will know if it implemented location-data-gathering code itself. It might not know that some company, somewhere, is silently listening in on the advertising process and siphoning data from their app.[27]

51.    The entity harvesting the data from the RTB platform can pose as a potential advertiser with no plans of actually placing an ad but can scrape the data as part of the process.

52.    Tumblr has a RTB process through which user's location data and personally identifying information is shared.  RTB is a millisecond-short auction that determines which advertisers get to deliver their ad to users.  Here, the RTB process determines which advertisers' content appears on the Tumblr application.  During RTB, bidding advertisers can access users' device information, including the device's make and model type, its IP address (a known proxy for a person's location), and oftentimes more precise location data if granted by the app user.

53.    But the RTB process is not open only to advertisers. Companies and data brokers monitoring these auctions also gain access to users' "bidstream" data. Data brokers, including Defendant Gravy Analytics, can combine that "bidstream" information with other data about those individuals from other sources to paint a detailed picture of someone's habits and movements.[28]

54.    When Tumblr allows third parties access to user data to serve targeted advertisements during the RTB process, user data is even provided to those entities who do not

---

[27] https://www.wired.com/story/gravy-location-data-app-leak-rtb/

[28] *Id.*

actually serve an advertisement on a consumer (such as Defendant Gravy Analytics, its agents, or other entities with which it contracts). This greatly diminishes the ability of users to control their personal information.

55.     Advertisers, government agencies, and investors are willing to spend hundreds of thousands of dollars for location data and the insights that can be derived from it.

56.     Consumers like Plaintiff are largely ignorant of the RTB process, which occurs wholly outside their knowledge.

57.     As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

> (a)     "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [i.e., website and app operators] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."
>
> (b)     "send[ing] sensitive data across geographic borders."
>
> (c)     sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[29]

58.     Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[30]

---

[29] Office of Technology & Division of Privacy and Identity Protection, *Unpacking Real Time Bidding through FTC's case on Mobilewalla*, Federal Trade Commission (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[30] Sara Geoghegan, *What is Real Time Bidding?* ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

59.     All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law. *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

60.     To summarize the preceding allegations, website and mobile application operators monetize their platforms through the use of real-time bidding. Through RTB, consumer information is provided to both advertisers who are interested in showing advertisements to users, and third parties who are allowed to monitor the RTB process. Advertisers then "bid" to show consumers an advertisement, with the winning bidder ultimately having their advertisement displayed to consumers. However, all interested advertisers and third parties with access receive consumers' information regardless of whether their bid ultimately wins.

61.     The value of those users is enriched by partnering with data brokers, data management platforms, and advertising exchanges, which enable those entities involved in RTB to link the information said entities collect from consumers on a particular website or app (such as the Tumblr application) with Defendant Gravy Analytics' vast repository of information and user profiles that it maintains on billions of consumers. This enriches the value of a website or app's user base because advertisers have a wider swath of information to use to target relevant consumers, meaning advertisers will pay more money to show users an advertisement on that website or application.

62.     Plaintiff was never informed that by using the Tumblr application, his personal data (including his location data) was made available on location intelligence and insights companies such as Defendant Gravy Analytics through monetization or through RTB.

**D. Plaintiff's and Class Members' Personal Data, Once Acquired by Gravy Analytics, Could Be Used to Identify People and Track Them to Sensitive Locations**

63.     Precise geolocation data, such as that collected and shared by Tumblr and obtained or purchased by Defendant Gravy Analytics, may be used to track consumers to sensitive locations, including places of religious worship, places that may be used to infer an LGBTQ+ identification, domestic abuse shelters, medical facilities, and welfare and homeless shelters.

64.     When collected across time, location data can reveal every aspect of a consumer's life.

65.     Defendant Gravy Analytics' business model, prior to the FTC's lawsuit, was to amass and sell raw location data derived from third party applications like Tumblr. This raw location data is used to track consumers' movements to glean insights into consumers' private lives. Defendant Gravy Analytics used this data to identify consumers based on attributes and behaviors the data reveals, including sensitive and personal attributes and behaviors, and then disclosed this information to third parties.

66.     These location signals, gathered from consumers' mobile phones, identify consumers' precise geolocation by latitude and longitude coordinates at the time the signal was gathered. Each location signal is associated with a Mobile Advertising ID ("MAID"), an alphanumeric identifier assigned to each user's unique mobile device. This unique identifier is assigned to a consumer's mobile phone to assist marketers in advertising to consumers. These data signals would be collected from a mobile device's GPS coordinates and, at times, augmented by other signals, such as WiFi.

67.     The location data that was collected, used, and sold by Defendant Gravy Analytics was sufficient to identify individual consumers, and was not anonymized. Persistent identifiers like MAIDs are personally identifiable information. Defendant Gravy Analytics' geolocation data,

combined with the mobile device's MAID or other persistent identifiers, identifies the mobile device's user or owner.

68.     Geolocation data collected by Tumblr and thereafter collected, monitored, used or purchased by Defendant Gravy Analytics was part of a data breach that revealed "more than 30 million location data points," including "devices located at The White House in Washington, D.C.; the Kremlin in Moscow; Vatican City; and military bases around the world." Data disclosed in that same Data Breach was sufficient to track "a person as they traveled from New York to their home in Tennessee."[31]

69.     In December 2018, *The New York Times* published an article entitled, "Your Apps Know Where You Were Last Night, and They're Not Keeping It Secret."[32] The article discussed how even supposedly anonymized location tracking can reveal individual identity through, for example, a consumer's work commute or time spent regularly at a home address. The article discussed how such tracking applications gather private information, noting one woman's concerns about the tracking of her visit for a medical procedure, a Weight Watchers meeting, and a stay at an ex-boyfriend's home. The article noted that "explanations people see when prompted to give permission are often incomplete or misleading" and do "not mention that the data will be shared and sold."

---

[31] TechCrunch, "A breach of Gravy Analytics' huge trove of location data threatens the privacy of millions," https://techcrunch.com/2025/01/13/gravy-analytics-data-broker-breach-trove-of-location-data-threatens-privacy-millions/.

[32] Jennifer Valentino-DeVries, et al., *Your Apps Know Where You Were Last Night, and They're Not Keeping It Secret*, The New York Times (Dec. 10, 2018), https://www.nytimes.com/interactive/2018/12/10/business/location-data-privacy-apps.html.

70.    As *The New York Times* reported in a September 2020 article entitled, "How Mobile Phones Became a Privacy Battleground—and How to Protect Yourself," phone users do not understand that their data is being tracked[33]:

> [I]t [is] nearly impossible for phone owners to track where their data goes or how it gets used, let alone prevent that data from being shared in the first place. . . . [T]he industry has no standards to follow, so it's difficult for everyone to figure out what is and isn't possible on any given device. What phone owners have instead are sometimes-complicated menus full of permissions that are buried deep within an operating system and rarely set up by default with their privacy in mind.

71.    A private investigator was able to obtain consumer data from another data broker like Gravy Analytics: Babel Street. Like Gravy Analytics' technology, Babel Street's Local X "tool relies on the mobile advertising ID that Google and Apple assign to each phone to serve users targeted ads. Advertisers can then build a growing profile of information around that ID based on where it accesses services that deliver ads."[34]

72.    But the nature of such tracking means that individuals are followed well beyond their shopping trip, actively tracking their whereabouts, including the most private moments of their lives:

> [T]he data . . . allowed a reporter to zoom in on the parking lot of an abortion clinic in Florida and observe more than 700 red dots, each representing a phone that had recently visited the clinic. Location X then allowed the reporter to trace the movements of one specific device.
>
> That device—and by extension, the person carrying it—began the journey in mid-June from a residence in Alabama. The person passed by a Lowe's Home Improvement store, drove on a highway, visited a church, crossed into Florida, and finally stopped at the clinic where the phone indicates the person stayed for two

---

[33] Thorin Klosowski, *How Mobile Phones Became a Privacy Battleground-and How to Protect Yourself*, The New York Times Wirecutter (Sept. 29, 2022), https://www.nytimes.com/wirecutter/blog/protect-your-privacy-in-mobile-phones/.

[34] Emma Roth, *An investigation exposes data brokers using ads to help track almost any phone*, The Verge (Oct. 23, 2024), https://www.theverge.com/2024/10/23/24277679/atlas-privacy-babel-street-data-brokers-locate-x-tracking.

hours before leaving and returning to Alabama. The data tracked the phone as having visited the clinic only once.[35]

73.     One advertising group previously used location data to target "abortion-minded" women with anti-choice advertising.[36]

74.     While details about Defendant's data cache remain opaque and in its sole possession, Defendant undoubtedly collected consumers' precise, minute movements, to private locations, unrelated to any consented-to services.

75.     As a preliminary matter, geolocation information is sensitive data that necessarily reveals a consumer's identity. Geolocation coordinates together with timestamp data—exactly the type of data Gravy Analytics collected—can reveal a consumer's home address, work address, and any other location they visit.

76.     Indeed, researchers from MIT found that a small location data sample is sufficient to identify an individual. The researchers analyzed timestamped location data for 1.5 million individuals over 15 months and found that only four timestamped locations are sufficient to identify 95% of individuals. Given 11 data points, the researchers could identify all individuals in the study. The reason for the findings is obvious: individuals have unique movement patterns, and it is not likely that someone else will be in the same locations at four different times of the day.

77.     The researchers commented that an individual may be identified with less than four data points simply by exploiting irregularities in an individual's behavior.

---

[35] Dan Goodin, *Location Tracking of phones is out of control. Here's how to fight back.*, Ars Technica (Oct. 23, 2024), https://arstechnica.com/information-technology/2024/10/phone-tracking-tool-lets-government-agencies-follow-your-every-move/.

[36] Sharona Coutts, *Anti-Choice Groups Use Smartphone Surveillance to Target 'Abortion-Minded Women' During Clinic Visits*, Rewire News Group (May 25, 2016), https://rewirenewsgroup.com/2016/05/25/anti-choice-groups-deploy-smartphone-surveillance-target-abortion-minded-women-clinic-visits/.

78.    By collecting timestamped geolocation data, unique device identifiers, and device fingerprint data, bad actors can connect an ostensibly "anonymous" ID (such as a MAID or other unique device identifier) to an individual and then collect data on their interests and activities. These bad actors can then create a comprehensive consumer profile by combing through this data.

**E. Tumblr and Other Applications Collect Personal Data, Including Location Data, and Gravy Analytics Accessed That Data from the RTB Process**

79.    Third party applications, including Tumblr, collect a considerable amount of PII and geolocation data from users of the Apps.

80.    Because this PII and geolocation is sensitive data that poses "an incalculable risk to personal privacy," companies are responsible for safeguarding it appropriately. Companies' failure to uphold this responsibility can have legal consequences: the Federal Trade Commission announced that it would dedicate the "full scope of its legal authorities to protect consumers' privacy" and would "vigorously enforce the law if we uncover illegal conduct that exploits Americans' location, health, or other sensitive data."[37]

81.    Tumblr runs ads on the non-premium version of its application.

82.    As a result of the events detailed herein, Plaintiff and Class members suffered harm and loss of privacy, and will continue to suffer future harm, resulting from Defendant's unlawful data collection practices, including but not limited to: invasion of privacy; loss of privacy; loss of control over personal information; loss of value and loss of possession and privacy of Personal Information; and other harm resulting from the unauthorized access to Personal Information.

83.    Additionally, as a result of Defendant's unlawful data collection practices, Plaintiff's and Class members' privacy has been invaded and their Personal Information is now

---

[37] Kristin Cohen, Federal Trade Commission, "Location, health, and other sensitive information: FTC committed to fully enforcing the law against illegal use and sharing of highly sensitive data," (July 11, 2022), https://www.presidency.ucsb.edu/documents/white-house-press-release-location-health-and-other-sensitive-information-ftc-committed

accessible to unauthorized third parties that may utilize this information to Plaintiff's and Class members' detriment.

## FTC'S ACTION AGAINST DEFENDANT

84.    In December 2024, the FTC took action against Defendant for the type of conduct underlying this complaint.[38]

85.    According to the FTC's complaint, Defendant's "Unfair Sale of Sensitive Data," "Unfair Collection and Use of Consumer Location Data Without Consent Verification," and "Unfair Sale of Sensitive Inferences Derived from Consumers' Location Data," as described above, constitutes a violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits "unfair or deceptive acts or practices in or affecting commerce."[39]

## CLASS ALLEGATIONS

86.    Plaintiff brings this action on behalf of himself and the following class pursuant to Federal Rule of Civil Procedure 23 (the "Class"):

> All residents of Massachusetts whose Personal Information was collected by Defendant without their informed consent.

87.    Excluded from the Class are Defendant and its affiliates, officers, directors, assigns, successors, and the Judge(s) assigned to this case and their immediate families and staff.

88.    **Numerosity**: While the precise number of Class members has not yet been determined, members of the Class are so numerous that their individual joinder is impracticable, as the proposed Class appears to potentially include hundreds of thousands of members who are geographically dispersed.

---

[38] https://www.ftc.gov/legal-library/browse/cases-proceedings/212-3035-gravy-analytics-inc-matter.

[39] https://www.ftc.gov/system/files/ftc_gov/pdf/2123035gravyanalyticscomplaint.pdf.

89.    **Typicality**: Plaintiff's claims are typical of Class members' claims. Plaintiff and all Class members were injured through Defendant's uniform misconduct, and Plaintiff's claims are identical to the claims of the Class members they seek to represent. Accordingly, Plaintiff's claims are typical of Class members' claims.

90.    **Adequacy**: Plaintiff's interests are aligned with the Class he seeks to represent, and Plaintiff has retained counsel with significant experience prosecuting complex class action cases, including cases involving alleged data privacy violations. Plaintiff and undersigned counsel intend to prosecute this action vigorously. The Class's interests are well-represented by Plaintiff and undersigned counsel.

91.    **Superiority**: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiff's and other Class members' claims. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for Class members individually to effectively redress Defendant's wrongdoing. Even if Class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

92.    **Commonality and Predominance:** The following questions common to all Class members predominate over any potential questions affecting individual Class members:

a.    whether Defendant engaged in the wrongful conduct alleged herein;

b.      whether Defendant's collection, storage, distribution, and/or use of Plaintiff's and Class members' Personal Information violated privacy rights and invaded Plaintiff's and Class members' privacy; and

c.      whether Plaintiff and Class members are entitled to damages, equitable relief, or other relief and, if so, in what amount.

93.     Given that Defendant engaged in a common course of conduct as to Plaintiff and the Class, similar or identical injuries and common law and statutory violations are involved, and common questions outweigh any potential individual questions.

## CAUSES OF ACTION

### COUNT I
### Unjust Enrichment

94.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

95.     Plaintiff brings this claim individually and on behalf of members of the Class against Defendant.

96.     Plaintiff and Class members unwittingly conferred a benefit upon Defendant. Defendant acquired valuable personal location information belonging to Plaintiff and Class members which it then sold to other parties without the consent of Plaintiff and Class members. Plaintiff and Class members received nothing from this transaction.

97.     Defendant has knowledge of such benefits.

98.     Defendant has been unjustly enriched in retaining the revenues derived from the sale of Plaintiff's and Class members' data, including their geolocation data. Retention of those moneys under these circumstances is unjust and inequitable because Defendant did not obtain the consent of Plaintiff and Class members before selling their data to third parties as described above.

99.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class members for its unjust enrichment, as ordered by the Court.

100.    Plaintiff has no adequate remedy at law for this claim.  Plaintiff pleads his claim for unjust enrichment in the alternative to any other claims he may plead, which inherently would necessitate a finding of no adequate remedy at law.  Alternatively, legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937). Furthermore:

a.    To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

b.    Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles Plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Plaintiff seeks such relief here.

c.    Legal claims for damages are not equally certain as restitution because claims under unjust enrichment entail few elements.

d.    A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law. Restatement (Third) of Restitution, § 4(2).

## RELIEF DEMANDED

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks

judgment against Defendant, as follows:

a.  For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class members;

b.  For an order declaring that Defendant's conduct violates the laws referenced herein;

c.  For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

d.  For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

e.  For prejudgment interest on all amounts awarded;

f.  For an order of restitution and all other forms of equitable monetary relief;

g.  For an order enjoining Defendant from continuing the illegal practices detailed herein; and

h.  For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all

claims so triable.

Dated: August 11, 2025                                Respectfully submitted,

By: */s/ James J. Reardon, Jr.*
     James J. Reardon, Jr.

**REARDON SCANLON LLP**
James J. Reardon, Jr. (BBO # 566161)
45 South Main Street, 3rd Floor
West Hartford, CT  06107
Telephone: (860) 955-9455
Facsimile:  (860) 920-5242
Email:  james.reardon@reardonscanlon.com

**BURSOR & FISHER, P.A.**

26

Philip L. Fraietta (*pro hac vice* forthcoming)
Julian C. Diamond (*pro hac vice* forthcoming)
Andrew Obergfell (*pro hac vice* forthcoming)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail:   pfraietta@bursor.com
          jdiamond@bursor.com
          aobergfell@bursor.com

*Attorneys for Plaintiff*